PREPARED BY THE COURT

**FILED**

JAN 1 1 2006

JAMES A. FARBER, J.S.C.
JUDGE'S CHAMBERS
SUSSEX COUNTY COURTHOUSE

                                                            SUPERIOR COURT OF NEW JERSEY
                                                            LAW DIVISION
                                                            SUSSEX COUNTY
                                                            DOCKET NO. SSX-L-685-04

CATHERINE DI PIETRO and VINCENT       :
L. DI PIETRO, husband and wife,                      Civil Action

       Plaintiffs,                                  :

       v.                                         :        STATEMENT OF REASONS

TO THE LAST DETAIL RENOVATIONS,
ROGER DROSSEL, JOSEPH A. MARROCCO, JR.:
and DONALD KALINICH,
                                                :

       Defendants.
                                                :

The Court tried this case on January 3 and 4, 2006. Plaintiffs, seeking to build an addition onto their house, contracted with defendants Roger Drossel and Joseph A. Marrocco, Jr., partners in a business named To The Last Detail Renovations (hereafter collectively "Renovations"). The parties executed a written agreement, which was marked into evidence as P-2. The complaint charges that the contract is deficient in failing to include the name and address of the home improvement company, pursuant to N.J.A.C. 13:45A-16.2(a)12.I; failed to include a start and finish date pursuant to N.J.A.C. 13:45A-16.2(a)12.iv; and failed to be specific with regard to the description of the work, pursuant to N.J.A.C. 13:45A-16.2(a)12ii in that the description of the work

1

to be done and products and materials to be used did not include "the name, make, size, capacity, model, and model year of principle products or fixtures to be installed, and the type, grade, quality, size or quantity of principle building or construction materials to be used."

It is clear from a review of P-2 that the contract did not include the name and address of the home improvement company. It is equally clear and acknowledged by the defendants in their testimony that the agreement did not include start and finish dates. Both of those deficiencies are clear technical violations of the regulations. It is equally clear that while the contract described in general terms the work that would be performed by Renovations, it in no manner specified the principle products and materials to be used or installed in the performance of the contract. This, too, was a violation of the regulations.

The plaintiffs further allege that the contract required the use of plywood, but that during the progress of the job Renovations used OSB instead. Plaintiffs complained; the parties negotiated; and it was agreed that OSB would be left in the garage area but would be replaced with the required plywood in the living space area of the addition. Plaintiffs argue now that the substitution of the OSB for the plywood without prior written permission was a regulatory violation of N.J.A.C. 13:45A-16.2(a)3iv. That regulation does, in fact, specify that it is an unlawful practice to substitute products or materials for those specified in a home improvement contract. The language of the contract, P-2, provides on page one that Renovations will "install sheets of plywood to roof and sides of the new building." Plaintiff also alleges that Renovations commenced certain work without complying with Hardyston Township's permit requirements as required by State regulation. N.J.A.C. 13:45A-16.2(a)10i.

The testimony was generally consistent among the parties that there were issues raised by the plaintiffs as the job progressed. Plaintiffs were dissatisfied upon viewing the trusses, which had

2

been installed by Renovations' framing subcontractor, defendant Ronald Kalinich. The trusses had been purchased by Renovations from Rowley Building Products. The trusses are delivered as a unit and are installed, in this case, by the general contractor and subcontractor. Kalinich cut the trusses where the trusses met one of the supporting walls. Plaintiff complained, as he believed that cutting the trusses undermined the structural integrity of the truss, and, therefore, the roof. No expert testimony was provided during the trial by either party, though defendants contended that the cuts they made had not impaired the trusses. However, in evidence as D-2 is a field drawing of the trusses delivered to plaintiffs' house. The drawings are sealed by an engineering company. The document sets forth the appropriate installation and contains the following note: "Do not cut or alter truss member or plate without prior approval of a professional engineer." Defendant, during his examination, indicated that he had not read D-2, nor did he consult with any engineer or the manufacturer before cutting the trusses.

Plaintiff insisted that the trusses be removed and replaced. That caused a delay in the progress of the job.

As indicated above, the plaintiff noticed that the defendants were installing OSB instead of the contractually-required plywood and objected. Although he agreed to let the OSB remain in the garage, Mr. DiPietro, who was previously treated for cancer and has continuing medical concerns, required the OSB be removed from the living space portion of the addition. Again, that required extra time both to remove the incorrectly-installed OSB; order the replacement plywood; and install the plywood as originally specified. Mr. Marrocco testified that the plywood costs a couple of dollars more per sheet, but he indicated that he was not even sure what the acronym, OSB, means.[1]

---

[1] A Google search of OSB indicates it is an acronym for oriented strand board.

The contract required on page 3, "building new decks, 12 X 22, 17 X 27, 2 5 X 23 walkways and lattices skirt bottom and safety gate." On page 5 of the contract, which in effect was a change order to add an additional garage space and door for $5,000, bringing the total of the contract to $91,700, Mr. Drossel wrote, "Deck will be done while project is being complete." Therefore, in the summer of 2004, around the same time the plywood was being ordered and installed to replace the OSB, the plaintiff began to insist that his existing deck be removed and footings be dug for the new deck. Mr. Marrocco testified that, at plaintiff's insistence, Renovations did, in fact, cause the old deck to be demolished and footings bored. He testified that he did not get a permit from Hardyston Township for either aspect of the work, though he acknowledged that the deck work was going to require its own permit, separate and apart from P-20, the construction permit. The construction permit did not include the deck work; it was limited to the garage and addition and alteration.

The Court finds that the plaintiffs plead Consumer Fraud Act violations and proved them.

There were other issues right from the beginning when the parties first met. The plaintiffs provided a sketch of what they hoped to achieve. That sketch is P-26, and shows the four livable space rooms of the addition, each contiguous to two of the three remaining rooms and without any hallway separating them or taking up space. The defendants had a friend, a draftsman, draw the plans to be submitted to the municipality. It required several iterations. At least one of those iterations was discarded because it showed a hallway separating the rooms; the plaintiffs, understandably, rejected it. The delays that occurred at the front end of the process between the time the parties initially agreed to go forward in September of 2003 and the actual commencement of work the following May are not really attributable to either of the parties. Plaintiffs acknowledge that the original oral estimate that the work could be performed in 6-8 weeks and completed by Christmas of 2003 was unrealistic. Even the plaintiffs acknowledge that the necessity of revising

4

the plans a couple of times and waiting for the municipal officials to review the plans delayed any progress because the contractor was not able to break ground.

However, once the work was begun in May of 2004, the plaintiff had a reasonable expectation of the work being completed in approximately 8 weeks. It was only when things were done incorrectly and had to be redone that the delays occurred and the plaintiffs lost confidence in Renovations. After 12 weeks of disruption at their home, the plaintiffs sought to stop the bleeding by terminating the contract. At that point they had paid $4,335 on September 25, 2003, with check #2008 (P-3); $43,618 on November 12, 2003, with check #2028 (P-4); $10,312 on June 10, 2004 by check #101 (P-5); $5,156 on July 1, 2004 by check #102 (P-6); and $3,450 by check #104 on July 27, 2004 (P-7) for a total of $66,871 of the total $91,700 contract price.

Even though they had paid substantial amounts, pictures in evidence taken between August 2004 and December 2004/January 2005 show substantial work remaining to be done. Electrical work was not completed. According to the municipal code official, sill straps were not used correctly and were too far apart; galvanized nails had not been used as required in wall studs to sill plate connection, resulting already in the "common" nails having rusted; too much of the rafters had been cut at the bird's mouth; floor joists in contact with masonry or concrete were not treated wood as required; there were still no anchors in sill plates in the sills in the portion of the addition next to the existing structure; the header in the rear of the addition was notched unacceptably to the code official; and the truss drawings for the lateral bracing detail was not available (see P-22). Many of these items were items the defendants claim they would have corrected if and when noted on a framing inspection, and the Court suspects they would have had no choice but to do so if they hoped to obtain a certificate of occupancy. The problem is not whether the defendants would have made the corrections. The major problem is that the inspection report, P-22, is dated August 13, 2004,

indicating there was still substantial work left on a contract that was supposed to take 6-8 weeks and for which construction had begun in mid-May, 2004. In addition, the plaintiffs had nothing but the footing holes for the deck in their back yard. Those holes had been left in a hazardous condition, and only when the plaintiffs' dog fell in one of the holes did the defendants return and fill the holes with tubing as a temporary measure. Fortunately the animal was not hurt, but in any event the plaintiffs lost the use of their yard for the entire season.

In short, the regulations require that a home improvement contract set forth a begin and end date. The contract, P-2, in this case did not have a start and end date. The oral representations made by the defendant, which defendant does not dispute, that the contract could be completed in 6-8 weeks, were never fulfilled. The defendants never came close to that target. At the end of 12-13 weeks from commencement of construction, there remained substantial work incomplete. With respect to the deck, the defendants had not yet even procured the appropriate permit from Hardyston Township. It is understandable that the plaintiffs had become leery and had lost confidence in the ability of the defendants to carry through with their contractual obligations. The plaintiffs were damaged by losing the use of the garage and addition for a substantially longer period than had been expected. As indicated, they lost the use of their back yard and pool for the entire 2004 summer season. Plaintiffs were forced to retain other contractors to perform the task at hand, and because of the passage of time, costs had risen.

Plaintiffs were unable to detail the exact nature of the damages. Although the Court is presented with copies of checks paid to R.J. Falcone Builders, the successor contractor to Renovations, totaling $102,030, no one from R.J. Falcone was offered to present evidence as to the materials and supplies provided by the defendants used in the completion of the project by R.J. Falcone. There was also insufficient evidence as to whether the price quoted by R.J. Falcone to do

6

the work which was already in progress was a reasonable price. Plaintiffs did not testify, for example, that he obtained different quotes for completing the work. It was implied, but left uncertain whether there was duplication of work. In addition to the $102,030 that plaintiffs paid R.J. Falcone, and the $66,871 they paid to Renovations, the plaintiffs paid out of pocket certain expenses in connection with the work performed by R.J. Falcone, as shown on P-25. P-25 is a series of receipts from the municipality totaling $621.75. Finally, the plaintiff testified that he paid the plumber retained by Renovations the $1,000 remaining on his bill. Apparently when plaintiffs paid check #104, P-7, in the amount of $3,450 to Renovations in July of 2004, that was to cover the complete proposal of JMF Plumbing. Renovations only paid JMF Plumbing $2,450, leaving a balance of $1,000 still due to that contractor. Plaintiffs paid the contractor the $1,000 directly.

The plaintiffs paid a total of $170,522.75 on a contract that was originally supposed to cost them $91,700, an increase of $78,822.75 over the original contract sum. Clearly there is an ascertainable damage in connection with the violation of the Consumer Fraud Act. The failure to include in the contract a start and end date has caused the plaintiffs significant damage. The failure of Renovations to provide plywood as set forth on the original contract has caused the plaintiffs more than nominal damage, although the amount of that damage cannot be specifically pegged. The defendant testified that the sheets of plywood costs a couple dollars more per sheet and the garage remains constructed with the OSB. The plaintiffs' damages must be calculated based on the sketchy information provided as follows. As indicated, the total money paid out of pocket by the plaintiffs was $170,522.75. The contract amount with Renovations was $91,700, a difference of $78,822.75. The Court finds the $78,822.75 to be the total damages incurred by the plaintiffs as a result of the violations of the Consumer Fraud Act and the breach of contract by the defendants.

Of the $78,822.75 total damages, a portion is directly attributable to the violations of the Consumer Fraud Act. The Court finds that the difference in the contract price with Renovations of $91,700 and the amount paid to R.J. Falcone of $102,030 reflects the inflationary costs of doing the home improvements sought by the plaintiffs from September 2003 to April 1, 2005, when R.J. Falcone was paid the first installment on the completion contract, a total period of 19 months. Defendants are responsible for the delays, certainly, from August 1, 2004, when they should have completed the project at the latest, or a period of eight of the 19 months, so they are responsible for 8/19 of the $10,330 difference in contract price; that equals $4,349.47. Plaintiffs were also, as indicated, specifically damaged by the remaining OSB in the garage, but the plaintiff has offered no proofs with regard the specific damages on that item. Since the $4,349.47 is a Consumer Fraud damage, it must be trebled. Plaintiffs are awarded damages against defendants Renovations as follows:

| | |
|---|---|
| Total expended | $170,522.75 |
| Less original contract price | $ 91,700.00 |
| Subtotal | $ 78,822.75 |
| Portion of subtotal attributable to Consumer Fraud | $ 4,349.47 |
| Consumer Fraud amount trebled | $ 13,048.41 |
| Therefore, breach of contract damages | $ 78,822.75 - $4,349.47 = $74,473.28 + |
| Consumer Fraud treble damages | $ 13,048.41 = $87,521.69. |

In addition, under the Consumer Fraud Act the plaintiffs are entitled to attorneys' fees in connection with the Consumer Fraud portion of the damages. Counsel may submit a certification with that guidance for attorneys' fees to be awarded in plaintiffs' favor and against defendants.

8

The defendants, Renovations, have cross claimed for contribution and indemnification from defendant Kalinich. Defendants Renovations did not present any proofs with regard to direction they gave their subcontractor Kalinich. It is unclear whether Mr. Kalinich bears any liability with respect to his subcontract. The Court is unable to find, by a preponderance of the evidence that there was any breach of duty by Mr. Kalinich owed to defendants Renovations. There is also no privity of contract between the plaintiffs and Mr. Kalinich, and therefore their action against Mr. Kalinich is dismissed, as are all cross claims between the defendants.

It is unfortunate that the Court must impose the amount of damages set forth above as it appears to the Court that the defendants were more inept than malicious, but there is no excuse for the defendants' acknowledgement that they had no idea that they were required to comply with the Consumer Fraud Act. People who engage in the business of home improvements, as in any business, must make themselves aware of legal requirements imposed upon the conduct of their enterprise.

_____
James A. Farber, J.S.C.